## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**<u>Alain Ata</u>**

   v.

**<u>Strafford County Department of
Corrections, Superintendent, et al.</u>**

Case No. 1:26-cv-6-PB-TSM
Opinion No. 2026 DNH 036

### <u>MEMORANDUM AND ORDER</u>

After over fifteen years of inaction on his final order of removal, Immigration and Customs Enforcement ("ICE") revoked Alain Ata's release last December and arranged to deport him to Lebanon, his home country. According to the government, following years of difficulty securing travel documents for Ata, ICE has recently experienced improved cooperation from the Lebanese government in facilitating the return of removable Lebanese nationals from the United States. With that newfound cooperation, ICE says it has obtained the paperwork needed to deport Ata next week.

Ata responds that this development is but an apparition. He contends that ICE remains unable to effectuate his removal to Lebanon, rendering his detention pending such an eventuality unconstitutional under Zadvydas v. Davis, 553 U.S. 678 (2001). He also argues that ICE deprived him of meaningful notice when it revoked his release, violating 8 C.F.R. § 241.13.

Before me now is Ata's petition for a writ of habeas corpus to that effect. For the reasons below, I deny his requested relief for now.

## I. **BACKGROUND**[1]

Ata, a Lebanese national, has lived in the United States since 1995. Although originally a lawful permanent resident, Ata was convicted in 2005 of burglary, simple assault, and receipt of stolen property in New Hampshire state court. Shortly thereafter, Ata was placed in removal proceedings. After serving his criminal sentence, he was transferred to federal custody in Louisiana, where he remained in custody until 2009, when an immigration judge ordered him removed. Unable to secure travel documents from the Lebanese government to facilitate his repatriation, ICE eventually released Ata pending his removal, subject to an order of supervision pursuant to 8 U.S.C. § 1231(a)(3).[2]

---

[1]    Except where otherwise indicated, the facts pertinent to resolving Ata's petition are not in dispute. I largely draw Ata's history from the pleadings, clarified where necessary by the parties' proffers at oral argument.

[2]    While the government does not say so explicitly, in agreeing with Ata that his release was governed by 8 C.F.R. § 241.13, it appears to acknowledge that he was released because it was not significantly likely that he could be removed to Lebanon in the reasonably foreseeable future. See 8 C.F.R. § 241.13(a) ("This section establishes special review procedures for" an alien who "has provided good reason to believe there is no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future.").

Ata remained free for the next seventeen years. That freedom ceased about four months ago. On December 16, 2025, Ata appeared in New Hampshire state court again for a bench trial on more criminal charges, this time for disorderly conduct and resisting arrest. Immediately after the trial concluded that day—but before the presiding judge issued a decision—ICE personnel apprehended Ata in the courtroom. Ata was subsequently transferred to Strafford County Department of Corrections, where he remains in federal custody. Sometime later, he was acquitted on all charges.

Significantly, on the date of his arrest, ICE personnel never apprised Ata of their reason for revoking his release. In fact, ICE did not explain itself until December 24, 2025, when it issued Ata a "Notice of Revocation of Release." That notice, while largely boilerplate, states in relevant part that "based on a review of [his] official alien file," ICE determined that "changed circumstances in [Ata's] case" indicate that "there is a significant likelihood of removal in the reasonably foreseeable future." Elaborating further, the notice explains that Ata could soon be removed under his final order of removal from 2009 because "[his] case is under current review by the Government of Lebanon for issuance of travel documents." The notice bears a notation that Ata refused to sign an acknowledgement of service.

Appended to that letter is a form citing 8 C.F.R. §§ 241.4(l) and 241.13(i), on which an ICE officer noted that he "conducted an initial

3

informal interview" "to afford the alien an opportunity to respond for the reasons for revocation" of his release. In a field for noting the alien's "oral response regarding the reasons for revocation," the ICE officer wrote, "No response given." Below, the officer did not respond to a prompt asking whether the alien "provide[d] a written statement," but on the form's final question, he did circle that the alien "did not" "provide any documents." That form is also dated December 24, 2025.

Two weeks later, Ata petitioned this Court for a writ of habeas corpus. Doc. 1. Ata claims that his present detention without an individualized bond determination violates his procedural and substantive due process rights under the Fifth Amendment. Id. at 10-12. He also alleges that his detention violates 8 U.S.C. § 1231 and 8 C.F.R. § 241.13. Id. at 14-17. In addition to asserting standalone counts premised on each, he argues that ICE's failure to comply with these authorities render its decision to detain him arbitrary and capricious under the Administrative Procedure Act. Id. at 12-14. Along with related relief, Ata seeks his immediate release. Id. at 17-18.

Following a status conference, the parties agreed to brief the Court on the legal issues pertinent to Ata's petition. See Doc. 12; Doc. 13; Doc. 14. That briefing was completed on March 30, 2026. The next day, complying with the Court's notice requirement, see Doc. 2, the government informed the Court that it has imminent plans to remove Ata to Lebanon. Doc. 15. The Court

held oral argument as scheduled on April 1, at which the government's counsel represented that ICE has arranged to deport Ata by way of a commercial flight to Beirut scheduled for the next week.

## II.  STANDARD OF REVIEW

When a person is held "in custody in violation of the Constitution or laws or treaties of the United States," habeas corpus relief is appropriate. 28 U.S.C. § 2241(c)(3). The habeas petitioner carries the burden of proving that his detention is unlawful. Espinoza v. Sabol, 558 F.3d 83, 89 (1st Cir. 2009) ("The burden of proof of showing deprivation of rights leading to an unlawful detention is on the petitioner.").

## III.  ANALYSIS

Ata makes two distinct arguments in support of his release. First, Ata urges that his release be reinstated because of ICE's failure to adhere to procedures for revoking his release required by 8 C.F.R. § 241.13. Second, Ata invokes Zadvydas to argue that, notwithstanding the government's arrangements for his travel to Lebanon, he is unlikely to be removed in the foreseeable future and must therefore be released as a matter of constitutional right. For reasons explained in turn, neither theory allows me to afford Ata relief at the present time.

## A.    <u>Notice of Revocation</u>

Ata trains his first attack on ICE's notice of its reasons for revoking his release, contending that the agency failed to provide an explanation for re-detaining him as soon and as detailed as required. Ata does not attempt to argue that he never received notice at all; rather, he tacitly acknowledges that he did—just too little, too late.

Under section 241.13,[3] an alien subject to a final order of removal who is nonetheless released under supervision may have that release revoked in one of two situations. First, ICE may revoke the alien's release if the alien violates a condition of release. <u>See</u> 8 C.F.R. § 241.13(i)(1). Second, ICE may revoke the alien's release if it determines "on account of changed circumstances" that "there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." <u>See</u> <u>id.</u> § 241.13(i)(2); <u>see also</u> <u>Kong v. United States</u>, 62 F.4th 608, 619-20 (1st Cir. 2023) (breaking this criteria into four elements: "(1) an individualized determination (2) by ICE that, (3) based on changed circumstances, (4) removal has become significantly likely in the reasonably foreseeable future"). In either case, ICE's "[r]evocation procedures" state that, "[u]pon revocation, the alien will

---

[3]    As noted, the parties agree that section 241.13 governs Ata's release and its revocation.

be notified of the reasons for revocation of his or her release." 8 C.F.R. § 241.13(i)(3). As the regulation explains, this notice serves the important purpose of enabling the alien "to respond to the reasons for revocation" and "submit any evidence or information" to the contrary. Id.

Here, as discussed, the parties agree that Ata received a letter from ICE purporting to provide notice as required by subsection (i)(3) on December 24. However, Ata contends that this notice was "perfunctory" and late.

Beginning with the notice's substance, I do not agree with Ata that ICE's notice failed to satisfy the minimum disclosure compelled by subsection (i)(3). ICE's letter makes plain its reason for detaining Ata: his case is "under current review by the Government of Lebanon for issuance of travel documents," which, in ICE's view, creates "a significant likelihood of [Ata's] removal in the reasonably foreseeable future." While brief, this statement conveys the essential basis for Ata's re-detention, teeing up ICE's justification for him to attack to the extent he is able. Significantly, ICE's identification of a reason that Ata's removal is more likely—as opposed to simply stating its conclusion—distinguishes his case from others in which courts have characterized ICE's explanation as "generic" and "conclusory." See, e.g., Vo v. Lyons, 2026 WL 323133, at *4 (D.N.H. Jan. 27, 2026) (rejecting revocation premised on statement that "ICE has determined that [Vo] [can] be removed from the United States" and that "the purposes of [his] release have been

served" (alterations in original)); Hashemi v. Noem, 809 F. Supp. 3d 1027, 1034 (C.D. Cal. 2025) (rejecting revocation premised on statement that "decision was made 'based on a review of your file and/or your personal interview on account of changed circumstances in your case'").[4]

As for the timing of the notice, Ata points to the eight-day delay between the revocation of his release on December 16 and ICE's service of the letter on December 24. That delay, Ata observes, violates the plain language of subsection (i)(3), which states that an alien will be given such notice "[u]pon revocation" of his release. 8 C.F.R. § 241.13(i)(3). Under such an unambiguous directive, it should come as little surprise that the government does not attempt to defend the timeliness of ICE's notice. Indeed, the government concedes that the December 24 letter was not issued "upon" the revocation of Ata's release and thus fell short of its obligations under subsection (i)(3). With that, I agree.

---

[4]     At least one district court in our circuit has found similar language to Ata's notice too "generic and conclusory" to satisfy subsection (i)(3)'s notice requirement. See, e.g., Hall v. Nessinger, 2026 WL 18583, at *7 (D.R.I. Jan. 2, 2026) (reviewing statement that "[Mr. Hall's] case is currently under review by Liberia for issuance of a travel document" (alteration in original)). I am unpersuaded by that court's reasoning, in large part because it leaves unclear what additional information ICE could provide regarding a pending travel document that would meaningfully enhance an alien's ability to respond.

The question that remains is the appropriate remedy. After all, Ata did, in the end, receive notice of ICE's reasons for revoking his release. An order from this Court to reissue substantially the same notice would do no more than compel redundancy. Still, Ata contends that I should nonetheless order his release as a deterrent measure, to discourage ICE from flaunting the notice requirements of subsection (i)(3) in future cases. And I take his point— absent habeas relief, it is unclear what recourse an alien otherwise has if the basic procedural obligations imposed by subsection (i)(3) go ignored.

In Ata's case, however, ordering his release based on ICE's failure to give contemporaneous notice would amount to a bureaucratic exercise. As I explain further below, ICE does, in fact, have credible reason to believe that it will effectuate Ata's removal in the immediate future. Thus, if I ordered ICE to release Ata, it could simply reissue a carbon copy of its December 24 notice to instantaneously re-revoke his release once again. Such an exercise would itself be perfunctory.[5]

---

[5]    While other courts in this circuit have granted relief on similar facts, their reasoning does not grapple with the futility of ordering release after ICE demonstrated support for its determination that removal is significantly likely and imminent under subsection (i)(2). See, e.g., Munagi v. McDonald, 2025 WL 3688023, at *2-3 (D. Mass. Dec. 19, 2025); cf. Vo, 2026 WL 323133, at *5 (ordering release where ICE did not did not even establish a sufficient post hoc justification for detention based on individualized likelihood of removal); Nguyen v. Hyde, 788 F. Supp. 3d 144, 152-53 (D. Mass. June 20, 2025) (same).

This result is not to say that the government's failure here was not serious. It was. Even an alien subject to a final order of removal, once granted release, is entitled to rely on subsection (i)(3)'s protections against arbitrary revocation of that release, including its promise "that ICE articulate a meaningful, individualized basis for revocation sufficient to give" notice of its reasons for doing so. Vo, 2026 WL 323133, at *4. That notice requirement is not merely regulatory; critically, it "implements the constitutional limits courts have recognized in Zadvydas." Id. But here, ICE ultimately managed to rectify its mistake on December 24. Had the agency neglected to substantially comply with its regulations, or had Ata brought his petition before it did so, we would have another story—but that is not the case. On these facts, there is no further relief that this Court can order which would affect Ata's detention.

## B.  **Reasonably Foreseeable Removal**

In the alternative, Ata seeks his release on a Zadvydas theory, arguing that his detention is constitutionally fraught because he is unlikely to be removed in the foreseeable future.[6]

---

[6]  Ata correctly notes that a successful Zadvydas claim in his case would necessarily reveal a violation of subsection (i)(2) as well, which essentially requires that the Zadvydas standard be met to revoke an alien's release based on "changed circumstances." See 8 C.F.R. § 241.13(i)(2) ("The Service may revoke an alien's release . . . if, on account of changed circumstances, the

10

In Zadvydas, the Supreme Court "'read an implicit limitation into'" the Immigration and Nationality Act, concluding that it "authorizes detention only for 'a period reasonably necessary to bring about [an] alien's removal from the United States.'" G.P. v. Garland, 103 F.4th 898, 901 (1st Cir. 2024) (alteration in original) (quoting Zadvydas, 533 U.S. at 689). After a six-month window during which an alien's detention is "presumptively reasonable," id., Zadvydas requires the alien's release when "it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future," 533 U.S. at 701. The six-month window is cumulative, meaning that an alien may have a ripe Zadvydas claim immediately upon re-detention if he or she was previously held by immigration authorities for six months or longer. See Siguenza v. Moniz, 2025 WL 2734704, at *3 (D. Mass. Sept. 25, 2025) (collecting cases).

Between his initial detention in Louisiana in 2009 and his detention at Strafford County since December, Ata has been in ICE's custody for more than six months, opening the door to his Zadvydas claim. See id. Now, he contends that "there is no reason to believe" that his removal is significantly

---

Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future."); see also Johnson v. Guzman Chavez, 594 U.S. 523, 529 (2021) (describing section 241.13 as "setting out the Zadvydas procedures").

likely because the government "ha[s] not claimed that repatriation to Lebanon" is more likely than when he was originally released on supervision in 2009. Doc. 12 at 5. In support, he points to the ongoing military conflict in the region, emphasizing the Department of State's maximum-severity travel advisory for Lebanon, which admonishes Americans not to travel to the country because of armed conflict.[7] At oral argument, Ata's counsel further enumerated several more reasons to doubt the feasibility of Ata's removal, including U.S. Citizenship and Immigration Services ("USCIS")'s assignment of temporary protected status to Lebanon nationals through May 2026;[8] USCIS's lapsed policy of deferred enforced departure for Lebanon, which precluded removals to the country until January 2026;[9] and the Department of State's ongoing pause on the processing of visa applications from Lebanese nationals.[10] While Ata concedes that none of these immigration policies apply

---

[7]     See U.S. Dep't of State, Lebanon Travel Advisory (last modified Feb. 23, 2026), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/lebanon-travel-advisory.html [https://perma.cc/ZDG3-2HUU].

[8]     See Designation of Lebanon for Temporary Protected Status, 89 Fed. Reg. 93641 (Nov. 27, 2024).

[9]     See Implementation of Employment Authorization for Individuals Covered by Deferred Enforced Departure for Lebanon, 89 Fed. Reg. 83901 (Oct. 18, 2024).

[10]     See U.S. Dep't of State, Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance (last modified

to him directly, they are nonetheless informative about the government's own views of its intent and ability to facilitate immigration between the United States and Lebanon.

In response, the government elides Lebanon's imperiled trajectory, representing to the Court that it can nonetheless effectuate Ata's removal to that country within the next few days. The government attached to its notice of intent to remove Ata a newly-acquired "travel document" for him—seemingly a Lebanese passport—that it recently obtained from the Lebanese government. Doc. 15-1. Our government further proffers that it has purchased a ticket for Ata on a flight to Beirut, scheduled for next week on Middle East Airlines, Lebanon's flag carrier. According to the government, Ata's removal will be a "witnessed departure non-escorted to Lebanon," Doc. 16, ostensibly meaning that ICE plans to see him off at his airport of departure. In response to Ata's observation of the ubiquitous cancellations of commercial flights to Lebanon over the last month, the government represents that Middle East Airlines continues to operate flights to Beirut despite the ongoing military conflict there. In fact, the government claims that it purchased Ata's ticket from Middle East Airlines "at increased

---

Feb. 2, 2026), https://travel.state.gov/content/travel/en/News/visa-news/immigrant-visa-processing-updates-for-nationalities-at-high-risk-of-public-benefits-usage.html [https://perma.cc/3BMM-H6DM].

expense" because ICE's "normal carrier . . . has temporarily paused air operations." Id. ICE attests that it has successfully removed between ten and forty aliens to Lebanon annually since 2019, although only three aliens thus far in 2026.

Admittedly, the government's inability to point to any removals to Lebanon since the present military conflict broke out raises questions about its ability to execute one in the next week. That said, the government's recent success in obtaining travel documents for Ata from the Lebanese government, coupled with its contemporaneous moves to arrange Ata's repatriation, strongly suggests that it will at least attempt to act on those plans on the schedule it proposes. Whether the government will succeed in doing so appears to hinge solely on whether Ata's Middle East Airlines flight departs as scheduled. Given the government's representation that at least some of that airline's flights continue to occur amidst the ongoing conflict and its intentional selection of that airline for that reason, I would be speculating to assume that Ata's itinerary will nonetheless be disrupted. Thus, without any non-speculative reason to doubt that the government can and will remove Ata next week, Zadvydas does not afford him relief from detention pending that removal. See 533 U.S. at 701.

Of course, if it turns out that the government is unable to remove Ata in the next week as scheduled, the apparent likelihood that it will foreseeably

14

do so will diminish considerably. Especially if such a failure were related to the ongoing military conflict—an inherently unpredictable geopolitical phenomenon with an unknown end date—the government will have demonstrated a fatal uncertainty of its efforts to remove Ata, and Ata would be well-advised to renew his Zadvydas claim.

## IV.  CONCLUSION

I decline to grant Ata's petition for habeas relief at present. Doc. 1. To the extent that conditions in Lebanon prevent the government from effectuating his removal next week and appear unlikely to abate in the "reasonably foreseeable future," Zadvydas, 533 U.S. at 701, Ata is free to renew his Zadvydas argument accordingly.

The parties shall file a status report in fourteen days.


SO ORDERED.


/s/Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge


April 3, 2026

cc:   Counsel of Record

15